## LANCASTER v. WHEELER.

An assignment made by an insolvent debtor for the benefit of his creditors, in accordance with Gen. Laws, c. 140, must in fact as well as in form provide for a proportional distribution of all his estate, except what is exempt from attachment, among all his creditors.

An assignment by an insolvent debtor, accompanied by payment in full of the assignee's private claim and the retention by the debtor of funds for the payment of the claims of certain other creditors, and the actual payment of the same in full before the transfer of the debtor's estate to the assignee, does not provide for the proportional distribution of all the debtor's estate in accordance with the statute, and is fraudulent and void.

REPLEVIN, for the stock of goods of a shoe factory in Salem. Plea, that the goods were not the property of the plaintiff, but were the property of one Kelly, and the defendant, a deputy sheriff, attached them on writs in favor of certain creditors of Kelly. Replication, that the goods were the property of the plaintiff, and issue joined thereon. The plaintiff is assignee of Kelly, an insolvent debtor. The assignment was dated, executed, delivered, and recorded March 9, 1882. The goods were attached by the defend-

ant March 11, 1882, and were the property of Kelly if the assignment is invalid.

The plaintiff testified,—I had been working for Kelly in the shop by the piece. In the evening of Wednesday, March 8, 1882, he told me he wanted to make an assignment of his property to me. I didn't object. By agreement then made, we met at the depot about 7 o'clock the next morning for the purpose of making the assignment. Can't say that he said anything to me at the depot until we got into the cars. I got into the cars to go to Exeter to get the assignment recorded, and for other business. When I left Salem depot I expected the assignment. The assignment was executed, sworn to, and delivered to me on the train after we started, perhaps half way to Lawrence. About 7 o'clock that morning, at the depot, Kelly paid me $10 or $12, being all he owed me for labor. I went to Exeter, had the assignment recorded, returned to Salem, and Kelly delivered possession of the property to me that evening, about 7 o'clock. There were about one hundred men at work for Kelly in the shop. He owed them $700 or $800 when the assignment was made. I afterwards filed a list of the claims against him, which I took from his books. The list did not include any of the workmen, or not more than one or two of them. None of them presented any claim. The day after I returned from Exeter I heard he paid the workmen while I was gone to Exeter. Should think it would be $700 or $800. Didn't ask him where he got the money, nor tell him it belonged to me. As assignee, I received none of his money. Eustis dissented from the assignment. Kelly paid the men every Thursday. What he paid us March 9 was for a week's work in the shop.

Bodwell, a witness called by the plaintiff, testified,—The plaintiff got home from Exeter about 7 in the evening of March 9. I was foreman of the shop. Kelly paid me in the shop, in the afternoon of that day; think in the middle of the afternoon, perhaps between 2 and 3 o'clock. He paid me all he owed me up to that day. He got back to the shop perhaps at 8 o'clock in the morning or middle of the forenoon. He paid the other workmen that day. They were all paid, so far as I know. Kelly told me, about the time he paid me, that he had made an assignment. That day I and the other workmen understood we were going to stop for a few days, or some time. The next day Kelly told Eustis he had made an assignment to Lancaster. There was no other evidence on the question of preferring creditors.

At the close of the plaintiff's evidence the defendant moved for a nonsuit, on the ground that the assignment and the preference of creditors were one transaction, and that the preference defeated the assignment. The court ruled that on that ground the assignment was not valid against the attaching creditors. The damages being agreed upon, a verdict was taken for the defendant, to be set aside if the ruling was wrong.

*G. C. & G. K. Bartlett* and *Jeremiah Smith*, for the plaintiff, took the following positions :

1. Since the revision of the statute in 1867, an attempt to give an unlawful preference does not vitiate an assignment, even though the preference is expressed in the assignment itself.   The present statute annuls the preference, and upholds the assignment in all other respects.

2. The payment of the workmen at the shop *after* the execution of the assignment did not vitiate the assignment.

3. The payment to Lancaster *before* the execution of the assignment was not an unlawful preference, and did not invalidate the assignment.

[The argument on the first and second points is omitted.   The argument on the third point was as follows :]

It is argued that the payment and assignment " are to be deemed in law one transaction."   They certainly were not so in fact.   They were acts done at different times, in different places, and of different natures.   The payment was a transfer of property directly from the debtor to the creditor.   The assignment was a conveyance to a third person to hold in trust for creditors.   See *Van Patten* v. *Burr*, 52 Iowa 518; *Daggett*, C. J., in *Bates* v. *Coe*, 10 Conn. 280, 292, 293.   The payment and assignment were not in fact one transaction, and there is no good reason for deeming them so by fiction of law.   It is said that otherwise a fraud will be committed on the voluntary assignment statute, that the spirit of the act will be evaded.

This argument is founded on a false analogy.  It overlooks the vital distinction between our voluntary assignment law and an involuntary bankrupt law (like the English or the U. S. bankrupt acts).   The bankrupt acts provide for involuntary transfers of property ; they are based upon the principle that the creditors have a right to force the debtor into an assignment in bankruptcy ; they define the acts which shall subject a debtor to the compulsory transfer of his property, and declare that the transfer shall relate back to the " act of bankruptcy," generally avoiding intervening liens.   The theory of our voluntary assignment law is entirely different.   It is wholly optional with the debtor whether to make a general assignment or not.   It is also optional with him when to assign.   He has a right to fix upon his own time to make an assignment, if he concludes to make it at all.   Until he makes it, his property remains at his own disposal, and when made it has no retroactive effect.   See *Lampson* v. *Arnold*, 19 Iowa 489.

Under an involuntary bankrupt law the effect of holding a previous transfer to be an unlawful preference is to increase the amount to be distributed *pro rata* among the creditors.   Under our voluntary assignment law such a holding (if it has the effect here claimed of invalidating the assignment) will result in annihilating the fund which would otherwise have been distributed *pro*

*rata.* " Those who have received their pay are safe ; but, because those are paid in full, they, who only have a *pro rata* at first, shall have even that reduced [or annihilated] in order to pay another creditor in full." *Lampson* v. *Arnold*, 19 Iowa 490.

In view of these considerations, it has been held that although a voluntary assignment statute may expressly prohibit the giving of preferences in the assignment itself, yet this does not prohibit the giving of preferences by antecedent acts. This court has held that our statute of 1834 did not prevent a debtor from pledging or mortgaging all his attachable property to pay a particular debt. *Low* v. *Wyman*, 8 N. H. 536 ; *Barker* v. *Hall*, 13 N. H. 298 ; *Danforth* v. *Denny*, 25 N. H. 155. See, also, *Meredith M'f'g Co.* v. *Smith*, 8 N. H. 347, and Burr. Ass. (4th ed.) 215. These decisions take the ground that the statute was not intended to interfere with, regulate, or prohibit any transfers or conveyances except such as fall within the description of general assignments purporting to convey all a debtor's property to trustees for the benefit of his creditors. " Assignment for the benefit of creditors " is a term of settled meaning. It signifies a transfer to some one who does not hold for himself alone, but in trust for others. " The statute could never have been intended to embrace a mortgage or a pledge of any or all of a man's property for the security of a particular debt. A debtor has an undoubted right to convey all his property to one of his creditors in satisfaction of his debt. The statute was not intended to prohibit· such a preference." *Low* v. *Wyman*, 8 N. H. 538.

Now, if the debtor can pay or prefer a creditor after he knows himself to be hopelessly insolvent, why may he not do so up to the moment of executing the assignment ? It is said that paying after he has made up his mind to assign amounts to a fraud upon the voluntary assignment : but how can a man commit a fraud upon his own power of choice ? Up to the moment of executing the assignment it was optional with the debtor whether to assign or not. In the present case Kelly might have changed his mind after paying Lancaster at the depot, and not have executed the assignment on the train. Until the execution of the assignment he had done nothing to lose his dominion over the property, and it remained entirely at his disposal. Either the debtor cannot give preference after he knows himself to be insolvent, or he can give it up to the moment when he actually exercises his option to assign. There is no logical middle ground. In *M'f'g Co.* v. *Smith*, 8 N. H. 349, *Richardson*, C. J., in deciding that the statute of 1834 was not intended to prohibit a debtor from assigning some particular part of his property for the purpose of paying a particular debt, said,—" Such a prohibition would be absurd so long as any creditor or creditors are permitted, as they are by our laws, to attach any property of the debtor, and thus apply it to the payment of their debts without the consent of the debtor." This

reasoning seems decisive here. If the debtor's power of preference exists so long as the creditor's power to attach exists, then the debtor's power to give preference is not terminated by his forming the intention to execute an assignment. The creditor may attach at any time before the actual execution of the assignment, although he is fully aware of the debtor's intention to assign.

We submit that " several circumstances, each perfectly lawful," cannot " make up an unlawful act." Kelly had a right to pay Lancaster. He had also a right to make a general assignment. We are " unable to perceive how the exercise of two lawful rights, accompanied by no unlawful intent, can be considered an evasion of the law, or how the intent which may exist at the exercise of one lawful right, afterwards to exercise another lawful right, can be regarded as an intent to evade the law." See the very able dissenting opinion of *Rice,* C. J., in *Holt* v. *Bancroft,* 30 Ala. 193, 206–208.

The question now presented has not been decided in this state. The remark of *Parker,* C. J., in *Rundlett* v. *Dole,* 10 N. H. 465, is a mere *dictum.*

We cite *Lampson* v. *Arnold,* 19 Iowa 479, 483, 487, 489, 490 ; *Bates* v. *Coe,* 10 Conn. 280, 283, 290, 293 ; *Dodd* v. *Hills,* 21 Kan. 707.

We are aware that in the later case of *Van Patten* v. *Burr,* 52 Iowa 518, the court repudiated some of the views expressed in *Lampson* v. *Arnold.* But even then they did not go to the extent of holding an assignment invalidated by a previous payment, but undertook carefully to distinguish (*p.* 523) between paying a debt and giving a mortgage to secure it.

*J. Hatch,* on the same side.

*I. L. Heath* and *Frink & Batchelder,* for the defendant.

CLARK, J. The act of 1834, relating to voluntary assignments for the benefit of creditors, which remained in force until the General Statutes, provided that no assignment for the benefit of the creditors of any debtor making the same shall be valid, unless it provides for an equal distribution of all the estate, rights, and credits of such debtor among all his creditors in equal proportion to their respective claims. Laws 1834, *c.* 163 ; Rev. St., *c.* 134, *s.* 1. In the revision of the statutes in 1867 a substitute for the act of 1834 was enacted, providing that " Every assignment made by any debtor for the benefit of creditors shall provide for a proportional distribution of all his real and personal estate, except what is exempt from attachment, among all his creditors, and, however made or expressed, shall be construed to pass all such estate." Gen. St., *c.* 126, *s.* 1. No change has been made since the General Statutes. G. L., *c.* 140, *s.* 1. Whether the change

made in the General Statutes was designed to have any other effect than to guard against the defeat of assignments from informality and technical defects we need not determine. The present statute, like the act of 1834, requires a proportional distribution of all the estate of the debtor, except what is exempt from attachment, among all his creditors. Section 2 provides that "No assignment shall be valid until the person making the same shall make oath, which shall be certified thereon, that he has placed and assigned, and the true intention of his assignment is to place in the hands of the assignee, all his property of every description, except what is by law exempted from attachment, to be divided among all his creditors in proportion to their respective claims." A preference of creditors, allowed at common law, is not permitted in assignments under the statute, and a discrimination or preference in favor of an individual or a class over the general creditors defeats the assignment.

The plaintiff's title to the stock of goods in controversy depends upon the validity of the assignment made to him by Kelly prior to the defendant's attachment. To maintain his action he must show an assignment in conformity to the statute. This he has failed to do. In form the assignment was sufficient, but in fact it was in direct violation of the requirements of the statute. It did not secure "a proportional distribution of all the estate of the debtor among all his creditors." After he had determined upon a distribution of his estate among his creditors and had informed the plaintiff of his intention to make him his assignee, and in contemplation of the assignment which was then prepared and ready to be executed, he paid the plaintiff's personal claim in full, and retained the sum of eight hundred dollars with which he paid his other workmen in full, on the same day after the execution and formal delivery of the assignment and before the transfer of his property to the plaintiff as assignee.

The payment of the plaintiff's claim, the execution of the assignment at the same meeting, and the payment of the workmen being all done in pursuance of the debtor's original purpose, must be deemed in law one transaction; a transaction consisting of a series of acts intended to produce one result,—the distribution of the debtor's estate among his creditors, securing to the plaintiff and the other workmen payment of their claims in full. Such a distribution of the estate was not a compliance with the statute, and the assignment must be deemed in fraud of its provisions and void as to creditors.

*Judgment on the verdict.*

DOE, C. J., did not sit: the others concurred.